TRACY L. WILKISON
Acting United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
ALEXANDER B. SCHWAB (Cal. Bar No. 283421)
JULIA HU (Cal. Bar No. 338226)
Assistant United States Attorneys
Major Frauds/General Crimes Sections
     1100 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-1259/3802
     Facsimile: (213) 894-0141/6269
     E-mail:    alexander.schwab@usdoj.gov
                julia.hu@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

                UNITED STATES DISTRICT COURT

              FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 12-829-SVW-1 |
|---|---|
| Plaintiff, | GOVERNMENT'S SENTENCING POSITION REGARDING DEFENDANT ERNESTO DIAZ |
| v. | Hearing Date: 11-15-2021 |
| ERNESTO DIAZ, | Hearing Time: 11:00 a.m. |
| Defendant. | Location:   Courtroom of the Hon. Stephen V. Wilson |

     Plaintiff United States of America, by and through its counsel
of record, the Acting United States Attorney for the Central District
of California and Assistant United States Attorneys Alexander B.
Schwab, hereby files its sentencing position regarding defendant
Ernesto Diaz.

     This sentencing position is based upon the attached memorandum
of points and authorities, the presentence investigation report

//

//

("PSR"), the files and records in this case, and such further

evidence and argument as the Court may permit.

 Dated: November 1, 2021          Respectfully submitted,

                                  TRACY L. WILKISON
                                  Acting United States Attorney

                                  SCOTT M. GARRINGER
                                  Assistant United States Attorney
                                  Chief, Criminal Division


                                        /s/
                                  _____
                                  ALEXANDER B. SCHWAB
                                  JULIA HU
                                  Assistant United States Attorneys

                                  Attorneys for Plaintiff
                                  UNITED STATES OF AMERICA

# TABLE OF CONTENTS

DESCRIPTION                                                                PAGE

MEMORANDUM OF POINTS AND AUTHORITIES.................................1

I.     INTRODUCTION.................................................1

II.    STATEMENT OF FACTS..........................................2

III.   SENTENCING GUIDELINES.......................................6

IV.    ARGUMENT....................................................7

       A.    The Egregiousness of Defendant's Fraud Offense Far
             Exceeds..............................................7

       B.    The Need for General Deterrence......................9

       C.    Defendant's Flight from Prosecution Further
             Demonstrates the Need for a Sentence Sufficient to
             Promote Respect for the Law and to Deter Similar
             Conduct.............................................10

V.     RESTITUTION................................................11

VI.    CONCLUSION.................................................12

**TABLE OF AUTHORITIES**

<u>DESCRIPTION</u>                                                                                           <u>PAGE</u>

**Federal Cases**

<u>Paroline v. United States</u>,
   572 U.S. 434 (2014) ......................................... 12

<u>United States v. Edwards</u>,
   595 F.3d 1004 (9th Cir. 2010) ............................... 10

<u>United States v. Martin</u>,
   455 F.3d 1227 (11th Cir. 2006) ............................... 9

<u>United States v. Rosas</u>,
   615 F.3d 1058 (9th Cir. 2010) ................................ 7

**Federal Statutes**

18 U.S.C. § 3553 ................................................. 9

18 U.S.C. § 3146 ................................................. 6

18 U.S.C. § 3147 ................................................. 6

18 U.S.C. § 3663A ............................................... 11

**United States Sentencing Guidelines**

USSG § 2B1.1 .................................................... 6

USSG § 3C1.1 .................................................. 6, 9

USSG § 3C1.3 .................................................... 6

USSG § 3E1.1 .................................................... 7

**Other Authorities**

S. Rep. No. 98-155 (1983).......................................... 9

Stephanos Bibas, <u>White-Collar Plea Bargaining and Sentencing After</u>
<u>Booker</u>, 47 Wm. & Mary L. Rev. 721, 724 (2005)...................... 9

1

### MEMORANDUM OF POINTS AND AUTHORITIES

2

## I.   INTRODUCTION

3
From 2010 to 2011, defendant Ernesto Diaz was a key player in

4
"Crown Point Education, Inc.," a business that claimed it could save

5
distressed homeowners from foreclosure and eliminate their mortgage

6
balances.  During his tenure at Crown Point, defendant delivered

7
seminars in which he marketed the program to prospective clients,

8
falsely touted its past success, and collected payments from the

9
homeowners.  He later admitted during 2012 interviews with law

10
enforcement that, contrary to the representations he made during the

11
seminars, he believed in the soundness of the U.S. banking system and

12
was unaware of a single occasion where Crown Point had successfully

13
saved someone's home.  In spite of all this, he continued to push the

14
Crown Point program on clients who spent what little savings they had

15
on the false promise that their homes could be saved.

16
In late 2012, defendant obtained counsel and entered a plea

17
agreement in which he agreed to cooperate against co-conspirators who

18
had worked with him at Crown Point, including Marcela Gonzalez, the

19
business's owner.  After making his initial appearance, however, he

20
failed to appear for his change of plea, instead fleeing to Mexico.

21
Defendant was arrested seven years later, but rather than accept

22
responsibility for his crimes, defendant put the government to its

23
burden by proceeding to trial, though, in mitigation, he did enter a

24
guilty plea to his failure to appear charge on the morning of trial.

25
After years of dissembling and refusing to accept

26
responsibility, defendant now faces sentencing for his crimes.  His

27
offenses, which victimized especially vulnerable people, require a

28
sentence sufficient to account for their seriousness and to deter

others tempted to follow a similar course of conduct.  The Court has significant discretion in selecting an appropriate sentence, but a low-end sentence of 262 months' imprisonment, while substantial in absolute terms, appropriately accounts for the various aggravating factors in defendant's case.

## II.  STATEMENT OF FACTS

As the government established at trial, during the height of the housing financial crisis, defendant falsely promised distressed homeowners that Crown Point's program could save their homes from foreclosure and eliminate their mortgages.  All the clients had to do was pay Crown Point approximately $15,000 for the company's services, with a partial payment demanded at the inception of the program.  In reality, defendant knew that the program had not worked and that Crown Point clients had lost their homes to foreclosure and eviction, including his own brother.

Defendant, an experienced real estate salesperson, joined Crown Point in approximately March 2010, soon after it had been started by codefendant Marcela Gonzalez.  Defendant and Gonzalez gave seminars pitching the Crown Point program to prospective customers.  At the seminars, defendant would both guarantee that the Crown Point program would be successful and claim that it had, in fact, been successful in clearing the mortgages of past customers.  Defendant deliberately kept the means by which the company purportedly eliminated existing mortgages "secret" under the auspices of protecting proprietary information.  In addition to regularly giving large group seminars, defendant met individually with customers and made similar representations in those meetings.  He also recruited and trained salespeople to give the same pitch.

1     In reality, Crown Point had had no previous success in
2  eliminating customer mortgage debt at the time defendant made these
3  promises, nor were any of its further efforts fruitful.  The Crown
4  Point program was largely predicated on mailing clients' mortgage
5  lenders certain documents demanding that the lenders "validate" the
6  borrowers' debt, or it would be eradicated.  The mailings were
7  legally worthless, and defendant knew so.  In some instances, lenders
8  responded, explaining that the mailings sent by Crown Point neither
9  precluded foreclosure nor eliminated mortgage balances, and noting
10 that the program appeared to be fraudulent.  Notwithstanding these
11 obvious signs of the scheme's failure and fraudulent nature,
12 defendant continued to market the Crown Point program as a guaranteed
13 success.

14     However, to create the appearance of legitimacy for customers
15 (and to charge them extra fees), the documents mailed to lenders were
16 notarized, many of them with the stamp of Noemi Amaya, defendant's
17 sister.  Defendant took her notary stamp from an office that the two
18 of them formerly shared and gave it to Crown Point employees to use
19 without her permission.  Indeed, Ms. Amaya testified at trial that
20 she had never worked for or even heard of Crown Point and had left
21 her notary stamp behind in the office space she previously shared
22 with defendant.

23     As the fraudulent nature of the Crown Point program became more
24 abundant, defendant and his co-conspirators took measures to delay
25 foreclosure in order to maintain the illusion that the Crown Point
26 program was working.  One such tactic involved using the bankruptcy
27 process to slow the eviction process by filing fraudulent bankruptcy
28 petitions in clients' names to trigger a stay of foreclosure

proceedings.  In many instances, these petitions were filed in clients' names without the knowledge or authorization of the purported petitioners, including with forged signatures.

Another foreclosure delay tactic that defendant and his co-conspirators used was clouding title.  Specifically, defendant and his co-conspirators would convey title to the clients' properties to a sham third-party entity or added additional names to the title.  In some instances, clients were aware this was being done but were not told the consequences; in many cases, clients were not aware that this was being done at all.  Neither title clouding nor the fraudulent filing of bankruptcy petitions eliminated the underlying mortgages of clients.

The entire time that defendant worked at Crown Point, numerous customers complained to him or came looking for him because the program was not working as promised.  Indeed, defendant's brother, Jesse Diaz, put his house through the Crown Point program, but had his house foreclosed in May 2010 and was evicted a few months later. By then, defendant stated in a later FBI interview, he knew for sure that the Crown Point program did not work.  Yet, defendant kept working at Crown Point -- and marketing it as successful —- until at least March 2011.  Indeed, defendant was recorded giving a seminar in November 2010, in which he claimed that Crown Point had been successful in the past and omitted the fact that the program had not worked for his own brother.[1]

---

[1] At trial, defendant testified that this was the only seminar he delivered after his brother lost his home and that he knew a confidential informant was present.  Not only are these claims incredible on their face, but they contradict the testimony of former Crown Point employees and clients who consistently stated that defendant regularly delivered seminars.

After his interview with the FBI, defendant obtained counsel, signed a cooperation plea agreement, and, on August 28, 2012, was charged in an information with one count of mail fraud in connection with his involvement in the Crown Point scheme. (Dkts. 1 & 5.) On September 13, 2012, defendant had his initial appearance before this Court and was ordered released on a $10,000 unsecured appearance bond, with travel restricted to the Central District of California and an order to appear for all court appearances. (Dkt. 7, 10.) A change of plea hearing was set for October 1, 2012, but defendant did not appear. (Dkt. 16.) The change of plea hearing was continued to October 15, 2012; again defendant did not appear. (Dkt. 17.) Instead, defendant fled to Mexico, where he was a fugitive for seven years until his arrest in the Central District on October 30, 2019. (Dkt. 194.)

In February 2020, a second superseding indictment was returned by a grand jury charging defendant with conspiracy to commit mail fraud affecting a financial institution, four counts of mail fraud affecting a financial institution, and failure to appear while released on bond. (Dkt. 212.) On September 9, 2021, defendant pleaded guilty to the failure to appear count and proceeded to trial on the fraud charges. (Dkt. 262.) During a three-day trial, jurors heard from various witnesses, including several clients of Crown Point who all had personal dealings with defendant, including victims C.T., G.T., T.S.J., and M.S.L.; former employees who spoke of defendant's managerial role at Crown Point and the increasing client complaints directed to defendant and Gonzalez; and FBI agents involved in recording one of defendant's fraudulent seminars, interviewing him in 2012, and tracking him down after his flight to

Mexico.  On September 13, 2021, defendant was convicted on the conspiracy count, two counts of mail fraud affecting a financial institution, and one count of mail fraud.  (Dkt. 270.)  Defendant was acquitted of count five, which corresponded to victim S.L., who passed away before the start of trial.

**III.  SENTENCING GUIDELINES**

As indicated in the government's objections to the PSR, the government submits that the following sentencing guidelines govern defendant's case:

| | | |
|---|---|---|
| Base Offense Level | USSG § 2B1.1(a)(1) | 7 |
| Loss > $3.5m | USSG § 2B1.1(b)(1)(J) | +18 |
| Sub. Loss > 5 victims | USSG § 2B1.1(b)(2)(B) | +4 |
| Use of Authentication Feature | USSG § 2B1.1(b)(11)(A)(2) | +2 |
| Bankruptcy/Educ. Misrep. | USSG § 2B1.1(b)(9)(B) | +2 |
| Obstruction of Justice | USSG § 3C1.1 | +2 |
| Offense Committed on Release | USSG § 3C1.3 | +3 |
| **TOTAL:** | | **38** |

When combined with his Category II criminal history, defendant's guideline range is **262 to 327 months' imprisonment.**

On the morning of trial, defendant did enter a guilty plea to failure to appear while on pretrial release, in violation of 18 U.S.C. §§ 3146 and 3147.  While both those statutes prescribe penalties that run consecutive to any other sentence imposed, the sentencing guidelines effectively treat both as enhancements, with failure to appear triggering an obstruction of justice enhancement and § 3147 increasing defendant's offense level by three under USSG § 3C1.3.  Ordinarily, defendant would be entitled to a two-level reduction for acceptance of responsibility for his guilty plea to the

6

failure to appear count.  But because that count is grouped with conduct for which he proceeded to trial and for which he is not entitled to acceptance of responsibility, he does not receive the benefit of § 3E1.1 in his overall guideline calculation.  See United States v. Rosas, 615 F.3d 1058, 1062 (9th Cir. 2010).  That said, defendant's acceptance of responsibility on this count of conviction is a mitigating factor in defendant's favor and supports imposition of a sentence at the low end of his guideline range.

**IV.  ARGUMENT**

**A.    The Seriousness of Defendant's Crime**

Defendant's fraud crime was more egregiousness than might be suggested by just the dollar figures involved.  Some of the witnesses who testified at trial provide a snapshot of the type of victims defendant targeted -- trusting, unsophisticated homeowners who, in the midst of some of the darkest moments in their lives, turned to Crown Point to save their homes from foreclosure and their families from eviction.  Victims G.T. and C.T. fell behind on their mortgage payments after George suffered a nearly fatal workplace accident that left him unable to walk and badly impaired his cognitive functioning.  Victim T.S.J. found herself unable to stay current on her home payments after the nursing school she ran closed and she underwent chemotherapy treatments for cancer.  Victim M.S.L., like many of Crown Point's clients, is a Spanish speaker who was asked to sign documents available only in English.  They are, of course, only a sampling of the hundreds of clients defendant victimized.

Defendant not only bled these victims dry of what little savings they had left, but also harmed them in ways not captured by the loss figures.  As detailed at trial, an integral part of the scheme

involved the filing of unauthorized bankruptcy petitions to delay the foreclosure process, thereby leaving victims with the impression that the Crown Point program was working and inducing them to continue making payments, along with whatever lingering effects the bankruptcy filings may have had on their credit ratings.  Many, though not all, of defendant's victims could have qualified for loan modifications or legitimate foreclosure forbearance programs to save their homes but, in reliance on defendant's lies, were never able to avail themselves of these options.  And, at the very least, victims could have used the money they gave Crown Point to make a few additional mortgage payments, allowing them to keep their homes a little longer and build additional equity before foreclosure.  It is impossible to quantify these harms in dollars and cents, but they far outstrip the direct losses attributable to defendant's scheme.

Also aggravating is defendant's theft of his sister's notary stamp from the office space the two of them shared and which was then used to provide a false imprimatur to the purported legal documents victims signed.  Such conduct, which blends both ordinary theft and identity theft, puts the lie to defendant's claim that he believed Crown Point was a legitimate business that only proved to be unsuccessful late in his tenure.

Finally, defendant testified falsely at trial in his own defense, claiming that he believed in the Crown Point process notwithstanding the fact that (1) he admitted to investigators that he did not doubt the validity of the banking system and was unaware of a single instance in which Crown Point had been successful; and (2) had signed, with the benefit of counsel, a plea agreement in which he admitted his guilt.  Ordinarily, such conduct would warrant

1   a two-level increase for obstruction of justice in defendant's
2   offense level.  <u>See</u> USSG § 3C1.1, comment. (n.4(B)).  But because
3   defendant pleaded guilty to failure to appear, he already receives
4   this enhancement.  <u>See</u> <u>id.</u> § 3C1.1, comment. (n.8).  Under the
5   circumstances, it is appropriate to consider defendant's false
6   testimony under 18 U.S.C. § 3553(a) as evidence of the seriousness of
7   his offense and danger to the community, since it demonstrates both
8   his lack of remorse and his willingness to employ deceit to advance
9   his goals even years after his original fraud crimes.

10      **B.   The Need for General Deterrence**

11      Crimes like the ones defendant committed are quintessentially
12   deterrable.  "Because economic and fraud-based crimes are 'more
13   rational, cool, and calculated than sudden crimes of passion or
14   opportunity,' these crimes are 'prime candidate[s] for general
15   deterrence.'"  <u>See</u> <u>United States v. Martin</u>, 455 F.3d 1227, 1240 (11th
16   Cir. 2006) (quoting Stephanos Bibas, <u>White-Collar Plea Bargaining and</u>
17   <u>Sentencing After</u> <u>Booker</u>, 47 Wm. & Mary L. Rev. 721, 724 (2005)).  In
18   fact, Congress, in drafting § 3553, confirmed that this common-sense
19   principle was one of the driving forces for including deterrence
20   among the goals of sentencing.  <u>See</u> S. Rep. No. 98-255, at 76 (1983),
21   <u>reprinted in</u> 1984 U.S.C.C.A.N. 3182, 3259 ("To deter others from
22   committing the offense . . . is particularly important in the area of
23   white collar crime.").  Indeed, Congress was expressly concerned with
24   the fact that "[m]ajor white collar criminals often are sentenced to
25   . . . little or no imprisonment," which the offenders disregard as "a
26   cost of doing business."  <u>Id.</u>  As the Ninth Circuit has explained,
27   fraud "tends to be a planned, deliberate crime, which allows plenty
28   of time for reflection, calculation of the odds of success or

1  failure, and the ultimate decision." <u>United States v. Edwards</u>, 595
2  F.3d 1004, 1021 (9th Cir. 2010).

3      Both the profitability of defendant's crimes and the difficulty
4  in exposing them support a substantial sentence to provide adequate
5  deterrence.  Defendant's scheme was immensely profitable, with the
6  Crown Point program bilking its clients out of millions.  The scam
7  also targeted the types of financially unsophisticated victims who
8  were least able to recognize it for the fraud that it was.  Defendant
9  and his co-conspirators also cloaked Crown Point in a venire of false
10 legitimacy, enabling him to avoid detection from existing customers
11 while enticing new clients to pay for Crown Point's "services"; the
12 official-looking office space, the reams of worthless documents
13 filled with impenetrable legalese, the use of a notary stamp
14 defendant stole from his sister -- all of these devices helped entice
15 new victims and made it more difficult for clients and outsiders to
16 detect the fraud that was occurring.  In these circumstances, where
17 the profitability of the crime is high and its rate of detection low,
18 the need for deterrence is at its zenith.

19      **C.   Defendant's Flight from Prosecution Further Demonstrates
20           the Need for a Sentence Sufficient to Promote Respect for
             the Law and to Deter Similar Conduct**

21     Defendant's fraud crimes were callous, calculated, and
22 calamitous.  On their own, they would merit a significant sentence of
23 imprisonment.  But defendant took his crimes a step further: After
24 promising prosecutors he would cooperate against his co-conspirators
25 and promising the Court that he would appear as ordered, he instead
26 fled to Mexico, where he remained for approximately seven years
27 before his eventual arrest in October 2019.

28

A defendant's flight is an attack on the judicial process itself.  If successful, a fugitive will never pay the price for his crimes and his victims will never receive restitution or any other form of accountability.  But even if a fugitive is eventually caught, as defendant was, the flight from prosecution imposes serious costs.  Some witnesses' memories may have faded while others may become unavailable.  In this case, victim S.L, referenced in count five of the second superseding indictment, passed away before trial, and it is likely no coincidence that that is the count on which defendant was acquitted.  Fleeing from prosecution also generally increases the costs on the government to achieve justice.  Neither of the two prosecutors at trial represented the government at the time defendant was original charged and fled the country, and as the Court heard at trial, of the two original case agents, one had retired from the FBI while the other had long been reassigned out of state -- most recently to Iowa.  Given prosecutorial challenges like these, many who flee will be better positioned to avoid conviction, and a more severe sentence is necessary for future offenders to consider the costs of fleeing prosecution to outweigh the benefits.

**V.    RESTITUTION**

Restitution is required in this case pursuant to the Mandatory Victims Restitution Act.  18 U.S.C. § 3663A(c)(1)(A)(v).  While it would be tempting to order restitution in this case based on the payments victims made to Crown Point during the period that roughly corresponds to his time working there, doing so would understate the losses defendant caused.  As client files presented at trial attest, victims commonly made monthly payments to Crown Point, meaning that

11

1  many victims with whom defendant personally interacted continued

2  making payments even after defendant no longer worked at Crown Point.

3       The government acknowledges the difficulty in reaching an exact

4  restitution figure attributable to defendant's conduct in this case.

5  But, as the Supreme Court has cautioned, in awarding restitution, "a

6  court must assess as best it can from available evidence the

7  significance of the individual defendant's conduct in light of the

8  broader causal process that produced the victim's losses.  This

9  cannot be a precise mathematical inquiry and involves the use of

10 discretion and sound judgment." Paroline v. United States, 572 U.S.

11 434, 459 (2014).  The $3,060,519 this Court ordered codefendant

12 Marcela Gonzalez to pay in restitution pursuant to the stipulation

13 between her counsel and the government provides an appropriate

14 starting point for the restitution figure in this case.  (Dkt. 183.)

15 The Court should also order that defendant be made jointly and

16 severally liable for the restitution obligation along with

17 codefendants Gonzalez and Lopez.

18      The government will lodge separately under seal a copy of the

19 restitution list provided in connection with codefendant Gonzalez's

20 sentencing as well as provide a copy to the Probation Office.

21 **VI.  CONCLUSION**

22      For the foregoing reasons, the government respectfully requests

23 that this Court impose a sentence of 262 months' imprisonment

24 (concurrent terms of 238 months' imprisonment on counts one through

25 four and a consecutive 24-month sentence on count six); concurrent

26 five-year terms of supervised release on counts one, two, and three,

27 and three-year terms of supervised release on counts four and six; a

28

12

$500 special assessment; and full restitution, which the government estimates at approximately $3 million.